**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**Case No. 6:26-cv-_____-___-___**

THE BEARD CLUB, INC., a Delaware corporation,

Plaintiff,

v.

CF PARTNERSHIP HOLDINGS LLC, a Florida limited liability company, d/b/a BEST BEARD STUFF; and DANIEL CHANG d/b/a LEXINGTON CHANG, an individual and citizen of the State of Florida,

Defendants.

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

The Beard Club, Inc. ("Plaintiff" or "The Beard Club") hereby brings the present action against CF Partnership Holdings LLC ("CFPH") and Daniel Chang ("Chang") (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1. This is a false advertising and trade dress infringement case under the Lanham Act and related Florida laws. Defendants are making a variety of willfully false and misleading advertising claims regarding their beard growth products and Plaintiff's beard growth products and infringing Plaintiff's trade dress rights in its distinctive website design.

2. Defendants operate the brand Best Beard Stuff ("BBS") and sell beard growth products to consumers looking for a fuller beard, including the Best Beard Stuff's Beard Growth Kits that include BBS beard growth products such as the GROW® Maximum XXL Growth Accelerator ("GROW® XXL").

3. Defendants market these products through representations that their efficacy has been validated by independent institutions, government-backed science, clinical research, and established media. Those claims are false and are likely to deceive reasonable consumers of beard growth products, such as The Beard Club's customers. The claims are also material because consumers deciding between Best Beard Stuff products and competing beard-growth products, including those sold by The Beard Club, rely on those representations when choosing what to buy.

4. Several of Defendants' principal advertising pages are presented as independent news articles and tell consumers that a professional beard competition banned Best Beard Stuff Growth Kits for giving competitors an unfair advantage. That claim carries particular weight because it tells the consumer that an independent institution evaluated the BBS growth product and found it so effective at beard hair growth as to prohibit it. However, on information and belief, Defendants concocted this false story. The institution Defendants cite does not appear to exist and, regardless, on information and belief, the competition to which Defendants refer did not ban Defendants' beard growth products.

5. Defendants also cite specific clinical results for their growth products, including percentages for follicle growth, dermal thickness, and follicle density, and

attribute them to government researchers and published studies. Those claims carry particular weight because consumers treat government-backed and clinically tested products as safer and more reliable purchases. However, these claims are once again false or at least misleading. At least one of the government agencies Defendants name does not exist, and, regardless, the cited studies do not support the statements Defendants make.

6. Defendants further represent that BBS products have been featured in respected media such as GQ, Esquire, Essence, XXL, and Men's Health, claiming that GROW® is the "#1 Hair & Beard Growth Product Worldwide" and "The First Beard Growth Kit That Works." Those claims carry particular weight because consumers treat media coverage and market-leading status as independent confirmation that a product works. However, on information and belief, there was no such featured editorial coverage. BBS is also not the market-leader for beard growth products.

7. Defendants place their claims and misinformation where consumers make purchasing decisions, displaying the claims beside offers, product pages, and buy buttons. Consumers therefore are diverted at the point of purchase and make decisions about BBS growth products and The Beard Club products on representations of efficacy for the BBS products that have no reliable foundation.

8. In addition to the general misinformation about its own products, Defendants attack Plaintiff's products by name or depiction in its marketing, leading consumers to make direct comparisons between Plaintiff's and Defendants' products.

Plaintiff and Defendants directly compete for customers of beard growth products, and they sell to those same consumers through identical and similar online interstate channels and market through identical and similar online interstate marketing channels.

9. At the same time, Defendants copy elements of Plaintiff's marketing and website to elicit consumer confusion. Consumers who buy Defendants' products have contacted Plaintiff to request refunds for the deceptive products they purchased from BBS, believing they were Plaintiff's products. Plaintiff's customer-acquisition and retention costs have risen as a direct and proximate result of Defendants' deceptive advertising, and Plaintiff's goodwill is being eroded as the advertising continues. This action seeks to stop the false advertising and recover the competitive injuries Defendants have caused.

## PARTIES

10. Plaintiff The Beard Club, Inc. is a Delaware corporation with its principal place of business at 17 Westwood Avenue, Westwood, New Jersey 07675. The Beard Club sells men's grooming products, including beard-growth kits, beard-care products, and grooming tools, through its website at thebeardclub.com, Amazon.com, Target, Walmart, and CVS, amongst other channels. The Beard Club has built substantial goodwill in the BEARD CLUB brand among consumers seeking beard-growth and grooming products.

11. Defendant CF Partnership Holdings LLC is a Florida limited liability company that conducts business as Best Beard Stuff, a registered fictitious business

name. CF Partnership Holding LLC, doing business as Best Beard Stuff, identifies its principal place of business as 480 N. Orange Avenue, Orlando, Florida 32801.

12. Defendant Daniel Chang is, on information and belief, an individual residing in the State of Florida. On information and belief, Lexington Chang is an alias of a real person, Daniel Chang. On information and belief, Daniel Chang is the owner and registrant of the BEST BEARD STUFF trademarks. Trademark registration no. 5944306 for the BBS BEST BEARD STUFF mark is owned by "Lexington Chang." However, in Lexington Chang's older trademarks, including in trademark registration no. 4856657 for the LC LEXINGTON CHANG MIAMI mark, Lexington Chang identified himself as "Daniel Chang DBA Lexington Chang" under the signatory section. Chang is not only the registrant of the BEST BEARD STUFF trademarks but also the listed contact for CF Partnership Holdings LLC, and, on information and belief, the operator of the TikTok account @iamlexvalentino, which has over 10,000 followers and has been used to advertise BBS growth products. On information and belief, Chang owns and controls CFPH and personally controls and/or participates in the creation and dissemination of the advertising described in this Complaint.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a), and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

14. This Court has personal jurisdiction over Defendant CF Partnership

Holdings LLC because it is a Florida limited liability company with a registered address in Florida that transacts business in Florida, sells and ships products to Florida consumers, accepts returns in Florida, directs advertising into Florida through its website, Amazon, TikTok, Instagram, Facebook, and other paid social channels, and has committed tortious acts within Florida within the meaning of Fla. Stat. § 48.193.

15. This Court has personal jurisdiction over Defendant Daniel Chang because he resides in Florida, personally creates and disseminates advertising for BBS products through TikTok and other social media directed at Florida consumers, is the registrant of the BEST BEARD STUFF trademarks, and on information and belief personally directs and controls the LLC's advertising and business operations from within this State. Chang has committed tortious acts within Florida within the meaning of Fla. Stat. § 48.193.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(1). Defendant CF Partnership Holdings LLC resides in this District pursuant to 28 U.S.C. § 1391(c)(2) because it maintains its principal place of business in Orlando, is subject to personal jurisdiction in this District, and all defendants are residents of the State of Florida. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here. Defendants disseminated the false advertising from this District, direct advertising to consumers in this District, sell and ship products to consumers in this District, accept product returns in this District, and, on information and belief, Defendant Chang resides in

this District.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A. The Beard Club

17. The Beard Club sells beard-growth kits, beard-care products, and grooming tools to consumers seeking fuller facial hair. It sells to consumers directly through its e-commerce webpage at thebeardclub.com and through third party channels such as Amazon.com, Target, Walmart, and CVS. It has built substantial goodwill in the BEARD CLUB brand and its e-commerce website (thebeardclub.com).

18. Founded in 2015, The Beard Club began as a direct-to-consumer e-commerce business and has since grown into one of the leading brands in the men's beard care category. Its products include items such as Beard Growth Oil, Beard Growth Vitamins, and Beard Growth Vitamin Sprays, as well as functional goods such as the Beard Derma Roller and Beard and Hair Trimmer.

19. The Beard Club has spent in excess of $80,000,000 advertising and promoting its products, building a customer base of more than 2,000,000 purchasers who have generated over tens of thousands of five-star product reviews.

20. The Beard Club promotes its products through digital and social media advertising across Facebook, Instagram, X, YouTube, and TikTok, email and subscription marketing, retail media platforms, and endorsement partnerships with high-profile brand ambassadors.

21. Long before Defendant's conduct at issue, The Beard Club secured

federal registration of its core brand assets, including U.S. Trademark Registration No. 6,076,766 for THE BEARD CLUB, registered June 9, 2020.

22. The Beard Club and BBS compete for the same consumers through their direct-to-consumer websites and on Amazon, and they market to consumers through the same social media channels. Their competing products occupy overlapping price points and address the same purchase decisions.

### B. Defendants' Advertisements Are Misleadingly Designed to Look Like News or Independent Reviews

23. A consumer looking for a way to grow a fuller beard can land on any of at least six webpages Defendants host online. Each webpage is built to misleadingly appear as a news article or an independent product review as opposed to an advertisement. Each page carries a headline, a summary, a written narrative, and photographs offered as supporting proof of the written claims. On two of the websites, an author's name and follower count also appear. On information and belief, Defendants created these articles.

24. The six pages are as follows and are attached as Exhibits A through F:

- **Exhibit A**: https://bestbeardstuff.com/pages/how-best-beard-stuff-got-banned
- **Exhibit B**: https://bestbeardstuff.com/pages/how-grow-xxl-got-banned
- **Exhibit C**: https://bestbeardstuff.com/pages/how-grow-xxl-got-banned-new

- **Exhibit D**: https://bestbeardstuff.com/pages/6-reasons
- **Exhibit E**: https://bestbeardstuff.com/pages/6-reasons-kit
- **Exhibit F**: https://bestbeardstuff.com/pages/the-real-truth

25. Each page deceives consumers by obscuring that Defendants are the source of the webpage. While the word "Advertorial" appears on some pages, when it does appear it is in white-colored font which is also often in an illegibly small font size. Defendants are thus intentionally obscuring the source of the advertisement to mislead consumers about the false information provided in their advertisements. See circled in red below for an example of how small the "Advertorial" wording appears on Defendants' webpage reproduced at Exhibit A:

[continued on next page]




26. No link anywhere on Defendants' ecommerce homepage bestbeardstuff.com leads to any of these six pages, and no link from any of the six pages directs back to Defendants' bestbeardstuff.com homepage. They are structurally isolated from BBS's main site. A reader who arrives at these pages via search terms or social media links can reasonably be misled to understand them as independent from BBS rather than an advertisement by BBS.

## I. Defendants' Fabricated Championship Ban (Exhibits A-C)

27. The pages depicted in Exhibits A through C invent a fictitious story about Defendants' beard-growth products, claiming that they were so effective at growing beard hair that they were banned from the 2025 World Mustache & Beard Championships.

28. On information and belief, the World Mustache & Beard Championships does not exist. However, the World Beard & Moustache Championships ("WBMC") is a real competition held biennially. In July 2025, it was held in Pittsburgh. There are several categories that people can compete in with respect to their beards and mustaches.

29. Exhibits A through C tell readers that Defendants' products gave several competitors an unfair advantage over other competitors at the 2025 championships. According to the three pages, a group of new entrants nobody had seen before arrived with beards larger than anyone else's, such that no returning competitor won in a single category. Allegedly all awards went to these newcomers, and one newcomer had such an impressive beard that he was allegedly able to win two categories at once. The three pages go on to say that one of these new champions "admitted" he had used Defendants' products to grow his beard quickly. The judges are said to have disqualified him for it, after which other champions allegedly came forward to also admit to using Defendants' products.

30. The webpages shown at Exhibits A through C then allege that the competition's purported governing body, which Defendants call the "World Beard

Committee," banned Defendants' products from the championships. The reason given is that the products handed their users an "unfair advantage" over competitors who grew their beards without this help. On the webpage at Exhibit A, Defendants claim it was their Beard Growth Kit that was banned and determined to be an "unfair advantage"; on Exhibits B and C they replace the Beard Growth Kit with the GROW® XXL oil as the purportedly banned product.

31. A reasonable consumer of beard growth products, reading about Defendants' deceptive account of the 2025 championships, will be deceived into believing that an organization devoted entirely to judging facial hair looked at what Defendants' products did for real competitors and concluded the products worked well enough to disrupt the fairness of the contest. That conclusion is likely to persuade a reasonable consumer of beard growth products at least because the conclusion, namely that the BBS products are now banned, is delivered as bad news for Defendants, and a reasonable consumer would not expect a seller to invent a story in which it loses something. A reasonable consumer would thus take the page's purported reporting of the July 2025 championships as supporting the claim that Defendants' beard growth products work better than competing beard-growth products, such as The Beard Club's own beard growth products. These webpages also convert that conclusion into a purchase opportunity by offering discounted products and re-directing the reader to BBS's ecommerce product pages. However, consumers who believe this story are being misled about multiple material facts that Defendants use to make the claim about their growth products.

32. First, on information and belief, there is no "World Beard Committee." The July 2025 Championships were run by the "World Beard and Moustache Association," which publishes its rules and results at worldbeardchampionships.com. This is no mere case of mistaken identity. The World Beard and Moustache Association's published rules for the championships restrict styling aids, hair coloring, fake facial hair, extensions, and structural add-ons. No rule restricts beard growth products, and no rule mentions Defendants or anything Defendants sell. The ban is absent from the rulebook.

33. Second, on information and belief, no competitor admitted to the World Beard Committee that they used Defendants' products and was thereby disqualified in 2025 for such use. The 2025 rules did not prohibit the use of any beard growth products. But also, on information and belief, the World Beard Committee does not exist, and it could not have received any competitor's admission, disqualified any competitor, or banned Defendants' products.

34. Third, the claims about the results of the 2025 championship are false. The published results for the 2025 championships and prior championships show that, contrary to Defendants' claims, several 2025 champions had previously placed at World Championships, including Patrick Fette, Müge Mete, Andrew Kloss, Aaron Johnston, Jürgen Burkhardt, Haim Hoffmann, Patrick Quinn, David Benson, and Eddie Kimmerling. Patrick Fette, for example, won the English Moustache category in 2017, 2019, and 2025. Further, no champion won in two categories as Defendants claim. The WBMC 2025 rules permitted a competitor to enter only one

category, and the published WBMC 2025 results show that no contestant won in two categories, contrary to Defendants' claim.

35. Fourth, the pages also use photographs of supposed champions to support the story. On information and belief, at least one photograph that Defendants rely on is an AI-generated image and does not depict the genuine champions of the 2025 championships, including the below image:



36. Finally, the webpages shown at Exhibits A through C tell readers that local news stations covered the ban and that videos of competitors confessing to using the products went viral, showing 90-day results. On information and belief, no such news coverage nor videos exist. Because, on information and belief, the World

Beard Committee does not exist and could not have received any competitor's admission, disqualified any competitor, or banned Defendants' products, there could not have been videos or news coverage of such an event. Defendants further invented corroboration for their false account of the 2025 championships.

37. The pages' isolation from BBS's ordinary website navigation also reinforces their appearance as independent reporting. Although the links on the banned-story pages send readers onward to BBS's product purchase pages, no page on bestbeardstuff.com leads to the banned-story pages, and the pages contain no link back to the BBS homepage. A reasonable consumer of beard growth products who reaches it directly may therefore treat the story as a third-party account rather than BBS's own advertising.

38. Beard growth consumers who choose Defendants' GROW® products after reading the false account of the 2025 championships displace a purchase from other beard growth sellers, such as The Beard Club.

39. Importantly, because Defendants' websites are indexed by internet search engines, they can surface in response to ordinary consumer queries. A query searching for whether a beard growth product was banned from beard competitions returns Defendants' page among the first results, ahead of the World Beard and Moustache Association's own website.

40. The fabricated championship story is also reproduced by AI-powered answer tools, including Google AI Overviews and Gemini, which generate answers by synthesizing indexed web pages. When asked about Defendants' products or

about beard growth products banned from competition, those tools repeat information from Defendants' websites as though they are fact.

41. Defendants additionally disseminate their advertising claims about the supposed ban of BBS products and the products' purported superior performance through social media ads, such as via the Meta ad library.

42. Defendants wrote the story in a form likely to be picked up and repeated. It carries a news headline, a named governing body, a named event and date, a real city, direct quotation attributed to a named-category champion, a photograph, and specific factual assertions. Those are the features that make the text read as a factual report rather than as advertising, both to a human reader and to a system that ranks and summarizes web content. Defendants formatted the page to look like independent reporting, and a search result or a generated answer makes it appear to be independent reporting in fact.

43. Each reproduction extends the reach of Defendants' false statements beyond the consumers who visit Defendants' pages, to consumers who never encounter Defendants' website at all.

44. This is no accident. On information and belief, Defendants acted knowingly, willfully, and in bad faith when they purposefully structured their advertisements in a way that would seem like legitimate news to consumers to make their fabricated claims about their beard growth products. They repeatedly fabricated details that would bolster their claims, hid the source of their webpages, and shrank the text of the "Advertorial" labels until they were nearly invisible to the

naked eye. This behavior is directly material to whether consumers might choose to purchase Defendants' products. If a consumer believes Defendants' deception that an independent professional organization found that it worked so well that it was banned from competition, they may readily choose Defendants' products over any competitors. This conduct thus renders the case exceptional within the meaning of, and supports awards of disgorgement and enhanced damages and profits under, 15 U.S.C. § 1117(a).

45. Further, correction is not practically available to Plaintiff. Plaintiff cannot edit a search result or an AI-generated answer, and Plaintiff cannot know which consumers received the false account or in what form. As long as Defendants' pages remain indexed, the fabricated story will continue to be retrieved and repeated. Money damages alone cannot remove the story from circulation, and only an order requiring Defendants to take the pages down and replace them with corrective advertising can stop the reproduction of the false facts.

## II. Defendants' Deceptive Review Pages (Exhibits D-F)

46. In addition to the championship ban pages, Defendants host three additional advertisement pages that are individually deceptive about their origins and repeat the material deceptive claims Defendants make about their beard growth products.

47. The webpage at Exhibit D is an article-style advertorial that promotes Defendants' peppermint oil products, including GROW® XXL. It is formatted to look like a blog post by "Jon Carter" with "301.7k followers" and is formatted in a

royal blue color instead of the neon green used on BBS product pages. It tells consumers that traditional beard growth oils are "glorified conditioners" that "do absolutely nothing to wake up dormant follicles." It goes on to call competing products "snake oil" and "useless garbage that doesn't work." Having established to the consumer that competitors' beard oils are worthless, the page introduces what it calls "The Breakthrough: Organic Peppermint Oil" and heavily markets BBS's GROW® XXL product.

48. The webpage at Exhibit E is also formatted as an independent article comparing beard growth products, this time without any disclosure that it is an advertisement. The first image on this webpage includes two competing products sold by The Beard Club (depicted below), which products Defendants refer to as "cheap bullsh*t that sits on top of" a consumer's skin. Although Defendants blurred portions of the product labels, the products are readily identifiable to an ordinary consumer of beard growth products as The Beard Club's. Even through the blurring, each label displays The Beard Club's distinctive yellow logo in its recognizable "B" shape, centered at the top of the label above the white label text. The bottle shape, cap, color scheme, and logo placement together are unmistakably The Beard Club's. The page then goes on to promote, among Defendants' other products, BBS's GROW® XXL.



49. Exhibit F shows yet another webpage hosted by Defendants to look like an independent article. There is no disclosure that it is an advertisement and it also does not include any of BBS' neon green formatting. Instead, it is on a blank white background purportedly written by "Dr. Robert Patel" with "1.2m Views" and "183.4k Likes" titled "Doctors Just Discover Why Millions of Men Can't Grow Beards! (And It Has NOTHING to Do With Genetics)." It goes on to tell readers that its content was verified by a board-certified doctor named "Charles Merriman." This article is formatted to deceive reasonable consumers of beard growth products that it represents an independent review of the BBS growth products. But this webpage, like others, promotes BBS's GROW® XXL product. It specifically credits

peppermint oil in BBS's GROW® XXL product as activating follicles. The article claims that "GROW® XXL will continue to accelerate and maximize your beard growth more than ANY OTHER beard serum" and that it isn't a "Scammy Beard Oil" but rather is backed by "Science" with "Overwhelming Proof." On information and belief, the individual shown in Exhibit F purportedly demonstrating the efficacy of BBS growth products in the "Week 1" photograph is Chang.

50. Beard-growth consumers who choose Defendants' products after reading the deceptive articles displace a purchase they might otherwise have made from competing sellers, including Plaintiff.

51. The deception in Defendants' review pages (Exhibits D-F) is intentional. The pages are created to look like independent webpages when they are not. That is not accidental. It is a coordinated deception in which the signals a consumer would use to evaluate each article's reliability have been manufactured by the seller. The articles themselves also make deceptive material claims about the BBS growth products and deceptive material claims about The Beard Club's own growth oil. Defendants acted knowingly, willfully, and in bad faith and their conduct renders the case exceptional within the meaning of, and supports awards of disgorgement and enhanced damages and profits under, 15 U.S.C. § 1117(a).

52. Correction is not practically available to Plaintiff. The pages are indexed by search engines and, like Defendants' other advertorial pages, are capable of being retrieved and summarized by AI-powered answer tools. Plaintiff cannot edit the pages, cannot identify which consumers encountered it, and cannot know what

form the claims took when reproduced. Money damages cannot undo a consumer's belief about BBS products or The Beard Club's products after reading these pages or pages that AI and other sources summarize from them. Only an order requiring Defendants to remove the pages and issue corrective advertising can remedy the deception.

**C. Defendants Make Deceptive Claims About Their Beard Growth Products**

53. In their deceptively formatted articles, on their product pages, in their product advertising, and on their product packaging, Defendants make deceptive material claims about their beard growth products. Each of these claims is either literally false or intentionally misleading, likely to deceive a substantial portion of relevant consumers, made in interstate commerce, material to the purchasing decisions of reasonable beard growth product consumers, and likely to injure Plaintiff. These claims fall into the following categories, each of which is discussed in further detail below:

54. First, Defendants attribute the effectiveness of GROW® XXL and other BBS beard growth products to the presence of the ingredient peppermint oil, citing specific clinical statistics derived from a fictitious government entity that Defendants invented. On various ecommerce pages, Defendants make several claims about the efficacy of peppermint oil, including that peppermint oil is "60% more effective for hair growth than Minoxidil," that peppermint oil causes "92% faster follicle growth," an "81-120% increase in dermal thickness," and "218-370% more follicles." However, peppermint oil does not have the properties they ascribe to it, and the

citations they reference are misleading and deceptive.

55. Second, Defendants falsely market the performance of their beard growth kits and associated products, including their peppermint oil product GROW® XXL and their GROW® First Cut Boar Bristle Beard & Wave Brush, deceptively claiming that these kits and products are superior to competitors in helping to grow beard hair faster. The claims Defendants make include that their kits are "The First Beard Growth Kit That Works" and that their products "Accelerates Growth Rate by 5X," "Increases Your Follicle Density," "Enlarges Facial Hair Diameter," produces "Visible Results in 1-2 Weeks," and are "stronger than anything else." Defendants further claim that "100%" of consumers see increased beard growth after using Defendants' products. Defendants also deceptively claim that their products were reviewed in an unnamed "150-day study," are supported by "over 1,000 clinical studies," and generally claim that their conclusions are based on "pure science."

56. Third, Defendants make deceptive claims of independent media and award validation that includes fabricated coverage in prominent media publications such as Essence, GQ, Esquire, XXL, and Men's Health. However, on information and belief, no evidence of any such awards or publications exists.

57. Fourth, Defendants make deceptive claims regarding the origin and make of their products, claiming that their products are certified as "organic" and that they are "made in the USA." These claims are repeated on Defendants' product packaging, including on their GROW® XXL product.

58. Defendants have introduced their material deceptive claims into interstate commerce by and through their product packaging, e-commerce webpage (https://bestbeardstuff.com), their Amazon store (https://www.amazon.com/stores/BESTBEARDSTUFF/page/225433B9-8644-4007-88A4-51826C24F996), their TikTok page (@bestbeardstuff.com), their Meta account (https://www.facebook.com/bestbeardstuff/), Chang's TikTok page (@iamlexvalentino), Defendants' Instagram page (@bestbeardstuff), and any social pages of influencers hired by or associated with Defendants to promote BBS products.

**I. False Peppermint Oil Claims**

59. Peppermint essential oil is the ingredient present in Defendants' products, including GROW® XXL, that Defendants claim makes its beard growth products more effective than other competing products.

60. For example, Exhibit D introduces the ingredient under the heading "The Breakthrough: Organic Peppermint Oil" and calls it the discovery that separates GROW® XXL from competing products, explaining that users experienced 92% faster follicle growth and an 81-120% increase in dermal thickness, resulting in 218-370% more follicles.

61. Exhibit D places the numbers under a heading reading "Clinical Proof It Works." Exhibits A through C also include these same statistics and further explain that these three statistics come from a clinical trial run by three researchers from the "Korean Department of Health and Beauty."

62. The ecommerce pages for Defendants' GROW® Hair & Beard 11-in-1 Wash product provides a link to the cited paper: Oh *et al.*, Peppermint Oil Promotes Hair Growth without Toxic Signs, *Toxicological Research* (2014). This 2014 paper is the only cited source with respect to Defendants' peppermint oil claims. On information and belief, this is the same paper discussing the clinical trials Defendants refer to in Exhibits A through D.

63. Relying on the study, Defendants claim that peppermint oil outperforms minoxidil, going so far as to state that "[a] 2014 scientific study found it to be 60% more effective for hair growth than Minoxidil." The 2014 paper does not support Defendants' product claims and Defendants' claims about the paper are false and deceptive.

64. First, on information and belief, there is no government body named the "Korean Department of Health and Beauty."

65. Second, the 2014 paper does not support Defendants' product claims. The cited statistics relating to peppermint oil in the 2014 paper were in relation to mice, not humans. The researchers applied 3% peppermint oil to the backs of laboratory mice for four weeks. The 92% follicle growth figure is a score for how much hair covered the mice's skin at the end. The dermal thickness and follicle count figures are measurements taken from mouse tissue. There were no human users, because the study had no human subjects. It also did not involve human facial hair. Likewise, there is no substantiation within the 2014 paper for the claim that peppermint oil was "60% more effective . . . than Minoxidil", even for mice. This

claim is deceptive. On information and belief, no clinical trial of peppermint oil for hair or beard growth has produced the results Defendant claims.

## II. Defendants Falsely Market Performance of Beard Growth Kits and Associated Products

### i. Unsubstantiated Statistics

66. Defendants also deceptively advertise their beard growth kits and related individual products.

67. For example, several of Defendants' pages and social media sites repeat that 1,000 clinical studies were reviewed to develop Defendants' products to create a kit that "Accelerates Growth Rate by 5X," "Increases Your Follicle Density," "Enlarges Facial Hair Diameter," and shows "Visible Results in 1-2 Weeks." On information and belief, these claims are not substantiated and are false. Below is an example of Defendants' deceptive language that appears on Exhibit E about one of its growth kits:

> **The GROW® XXL Beard Growth Kit: 100% Money Back Guaranteed**
>
> After reviewing over 1,000 clinical studies and testing dozens of ingredients and formulas, we developed something stronger than anything else...
>
> **- Accelerates Growth Rate by 5X**
> **- Increases Your Follicle Density**
> **- Enlarges Facial Hair Diameter**
> **- Visible Results in 1-2 Weeks**

68. These same claims are repeated verbatim for Defendants' GROW® XXL product, as shown in Exhibit B below:




69. Similarly, Defendants' Amazon storefront claims that "100% of users experienced positive changes to their beards," "98% of users saw faster beard and hair growth," "97% of users agreed their hair and beard were fuller," and "95% of users experienced growth in new places." On information and belief, these claims are not substantiated and are false and deceptive. These claims are material to consumers of beard growth products because they validate the purchase decision. Below is a depiction of Defendants' Amazon storefront citing these statistics:




**ii. The Unidentified "150-Day Clinical Study"**

70. On several of Defendants' ecommerce pages, they discuss an alleged

150-day clinical study and state the natural ingredients in Defendants' Hair Growth Kit were studied for its restoration properties, and that the results showed it effectively stimulated new hair growth, reduced further hair loss, and prolonged the growth phase. Defendants' claim that the study showed 32.5% improved hair density, 90% increased follicle activation, and 80% hair loss reduction. Below is an example of how the information is presented on one product page:

> **Clinical study results**
>
> In a 150-day clinical study, the natural, active ingredient in the Hair Growth Kit was studied for its hair cycle restoration properties. The results showed that it effectively stimulated new hair growth, reduced further hair loss, and prolonged the growth phase.
>
> **The study concluded an average of:**
>
> 32.5%
> Improved hair density
>
> 90%
> Increased follicle activation
>
> 80%
> Hair loss reduction

71. Defendants do not identify the study. They give no journal, no author,

no year, and no institution. Unlike the peppermint claims described above, Defendants provide no link anywhere on their site to any paper supporting the 150-day claims and give no explanation for what was being compared and what the results they claim mean. On information and belief, these claims are not substantiated and are false and deceptive. These claims are material to consumers of beard growth products because they validate the purchase decision.

#### iii. False Grow Brush Claims

72. Defendants additionally sell the GROW® First Cut Boar Bristle Beard & Wave Brush, a brush that supposedly helps beard growth. Defendants tell readers that the brush is designed to "enhance" beard growth. However, there is no scientific basis for claiming that brushing a beard will increase the biological growth rate or create new hair follicles. A consumer reading that a brush is designed to "enhance" beard growth can reasonably understand that claim to mean the brush will make his beard grow more than it would without the brush. The representation is material because it gives a consumer a reason to purchase BBS beard growth kits. A beard growth consumer who believes the advertised brush enhances beard growth will choose a kit containing a brush with those claimed properties over a competing product that does not represent that their brush increases growth of beard hair. For example, two of The Beard Club's beard growth kits include a brush, but that brush is truthfully advertised as a grooming tool.

### III. BBS's Claims of Independent Media and Award Validation

73. Several of BBS's pages prominently display a "Featured In" section that

references Essence, GQ, Esquire, XXL, and Men's Health. The section is immediately visible to every visitor who lands on the homepage, https://bestbeardstuff.com/. BBS also calls GROW® XXL the "2020 Most Innovative Men's Grooming Product" on this same page, reinforcing the message that outside publications and an award organization evaluated and approved the product.

74. However, on information and belief, none of the five publications listed has published editorial coverage of BBS or GROW® XXL. On information and belief, BBS was not featured in any of the five publications and received no award for "2020 Most Innovative Men's Grooming Product" from an independent third-party.

75. These claims are material because they convey that people independent of BBS assessed their products and found any of them effective.

**IV. False Composition and Origin Claims**

76. Defendants' product pages for its beard growth products, including GROW® XXL, gummies vitamins, beard growth kits, and beard grow wash, display blanket claims that they are "All Natural & Organic" and "Made in the USA." The badges appear between the product description and the purchase links, under a heading "Benefits" in the position a consumer reaches after deciding he is interested



and before deciding to buy, as shown in the following image taken from a beard grow wash product page:

**i. "All Natural & Organic"**

77. Defendants' pages display a "100% Natural" badge immediately beside the "All Natural & Organic claim," depicting a round seal resembling a third-party certification mark. Viewed together, a reasonable consumer would understand these representations to mean that Defendants' products are entirely, or nearly entirely, made with organically produced ingredients and that an independent certifying body has verified that claim. As an example, the USDA's standard is the only federal definition of "organic," and it requires that products labeled "organic" contain at least 95% organic ingredients. Thus, reasonable consumers understand an "organic" representation on a product made from agricultural ingredients, such as the plant-based oils in Defendants' beard oil, to mean that the product meets that standard. Reasonable consumers of personal care products expect "organic" products to be those which are produced according to standards, such as to the USDA organic standards, which require operations to use practices that cycle resources, conserve biodiversity, and preserve ecological balance. On information and belief, none of Defendant's products advertised as organic are made entirely or nearly entirely from organically produced ingredients nor certified as organic by any certifying body.

78. Similarly, "all natural" and "100% Natural" conveys that the product contains no synthetic or chemically processed ingredients. On information and belief, Defendants advertise BBS products that contain synthetic or chemically

processed ingredients, including minoxidil.

79. These representations are material to purchasing decisions for these products. A consumer who applies a product to his face daily cares what the product contains. Some consumers believe that organic and natural products are safer than those that are not. For this and other reasons, products marketed as natural and organic are more desirable to some consumers considering competing products that otherwise offer similar value propositions. Consumers are willing to pay more for products they believe to be organic and natural. On information and belief, Defendants' organic representations enable Defendants to charge, and induce consumers to pay, a price premium for products that are not what they are represented to be, and divert to Defendants sales that would otherwise go to competitors, including Plaintiff.

**ii. "Made in the USA"**

80. Reasonable consumers understand an unqualified statement that a product is "Made in the USA" to mean that 100% (or nearly 100%) of the ingredients were grown or synthesized in the United States of America and that the product was entirely assembled and packaged in the United States of America. In fact, the Federal Trade Commission adopted an all or virtually all standard for unqualified U.S.-origin claims because its consumer research established that consumers read such claims to mean complete domestic manufacture, not merely domestic design, assembly, packaging, or ownership. On information and belief, Defendants apply the claim to products that contain ingredients and/or components

that are not grown or synthetized in the United States and/or were not assembled and packaged in the United States. For example, although the beard growth kits include Defendants' gummies in the kit the product packaging for the gummies do not include a Made in the USA claim whereas the product packaging for the GROW® XXL does. This supports Plaintiff's informed belief that Defendants have deceptively marketed their growth kits as Made in the USA.

81. Country of origin is material to purchasing decisions for a substantial segment of consumers. Some consumers buy domestically manufactured goods to support domestic employment. Others treat domestic manufacture as an indicator of quality control and ingredient safety, a consideration that carries particular weight for a product applied daily to the face. Some consumers in both groups will find the Made in the USA products to be more desirable after considering competing products that otherwise offer similar value propositions. Defendants place these badges directly above a purchase link where it functions as a reason (i.e., a "benefit") for a consumer to buy the product.

## V. Defendants' Extensive False Claims Make this Case Exceptional and Justify Disgorgement, Enhanced Damages, and Injunctive Relief

82. Defendants acted knowingly, willfully, and in bad faith with respect to the deceptive claims they have made about their beard growth products. Defendants fabricated endorsements, studies, and product claims. The specificity and variety of these fabrications, repeated across multiple pages and advertising channels over a sustained period, support the inference that Defendants knew the claims were false

and published them to deceive consumers into choosing Defendants' products over competing products, including Plaintiff's. This conduct renders the case exceptional within the meaning of, and supports awards of disgorgement and enhanced damages and profits under, 15 U.S.C. § 1117(a).

83. Each of these false claims is material to the purchasing decisions of reasonable consumers of beard growth products. In particular, Defendants' marketing includes clinical statistics, government endorsements, media coverage, awards, and organic and origin certifications which signal to consumers that Defendants' products are superior to competing products. A consumer who believes these representations is more likely to choose Defendants' products.

84. Correction is not practically available to Plaintiff. Defendants' false claims appear across their ecommerce pages, their Amazon store, associated social media accounts, and their advertorial pages, all of which are indexed by search engines and capable of being retrieved and summarized by AI-powered answer tools. Each reproduction extends the reach of Defendants' false statements to consumers who never visit Defendants' website at all. Plaintiff cannot edit Defendants' pages, cannot identify which consumers encountered the false claims, and cannot know in what form those claims were reproduced. Money damages cannot fully compensate for the harm to Plaintiff because Plaintiff cannot retract the claims from circulation or undo a consumer's belief that Defendants' products are clinically validated, government-endorsed, and media-recognized. Only an order requiring Defendants to remove the false claims and undertake corrective advertising can stop the ongoing

deception.

**D. Defendants' Disparagement of The Beard Club**

85. On information and belief, Chang markets BBS products through various social media accounts, including his personal TikTok account @iamlexvalentino.

86. Videos posted to these accounts are accessible to any TikTok or Instagram user and appear in the feeds of users whose activity indicates interest in beard care products.

87. In social media advertising on the TikTok account @iamlexvalentino, one video opens with the line: "Remember how that Beard Club oil was making your skin itchy?" and shows Plaintiff's products being thrown off a table or otherwise discarded, and the video tells viewers they will be throwing those products out soon. These videos thereby make a false and deceptive claim about Plaintiff's product: that it causes skin irritation. Plaintiff's beard oil does not cause skin irritation in reasonably typical Beard Club consumers. The statement is material because a reasonable consumer of beard growth products will choose to avoid facial products that irritate skin.

88. Similarly, BBS sponsors social media videos that disparage The Beard Club. For example, BBS sponsored a Facebook page operating under the name "Jon Lee" (https://www.facebook.com/people/Jon-Lee/61551399312461). On information and belief, Defendants operate or control this page, as the page's "Intro" states "Best Beard Stuff is responsible for this Page." In at least two of the

advertisements on this page, the speaker refers to Plaintiff's products as ineffective "bullshit." The videos partially obscure the product labels. But Plaintiff's products remain readily identifiable to an ordinary consumer of beard growth products as The Beard Club's. These videos make false and deceptive claims about Plaintiff's products and are material as reasonable consumers will choose to avoid products they believe are ineffective.

## E. Defendants Appropriate Plaintiff's Trade Dress to Cause Consumer Confusion

### I. Plaintiff's Trade Dress

89. Plaintiff presents its beard growth kits at thebeardclub.com through a distinctive combination of webpage elements (the "Trade Dress"):

[continued on next page]




[continued on next page]




[continued on next page]




[continued on next page]




(a) A three-tier kit ladder that includes the Starter Kit, the Advanced Kit, and the Ultimate Kit;

(b) For each tier, a purchase block consisting of a product photograph, an "Add to cart" control, a parenthetical review count, and a "See What's Inside" link;

(c) A "What's Inside" disclosure section beneath each purchase block, headed "What's Inside The [Tier] Kit," with the tier name set in bold within the heading;

(d) A repeating product module within each disclosure section: a product render isolated on a plain background, the product name as a bold heading beneath it, and a one- to two-sentence description of the item's features;

(e) A guarantee block consisting of a star review count in capitals, a

headline reading "BEARD GROWTH, GUARANTEED," and beneath it the line "No results using our regimen? You'll get a full refund with our Growth Guarantee," followed by a call to action;

(f) A three-step "How It Works" sequence, each step comprising a line-art icon, a short, capitalized step name, and a single explanatory line. Plaintiff's steps are "Take the Quiz," "Delivered to your door," and "Enjoy your Beard," with the second explained by the line "Easily manage monthly renewals, cancel anytime"; and

(g) A horizontal "Featured In" publication logo strip.

90. These elements are non-functional. Nothing about selling grooming kits online requires a three-tier ladder, a "What's Inside" heading, isolated product renders, a named guarantee program, or any particular three-step explanatory sequence. There are many possible variations of webpage designs that can be used to sell these products.

91. Plaintiff has used its Trade Dress since 2018, has spent significant resources and effort promoting it, and has accumulated over tens of thousands of five-star reviews. The Trade Dress is inherently distinctive and has acquired secondary meaning among the relevant consumers in the beard growth market. The distinctiveness of the Trade Dress is also proven by Defendants' intentional copying as discussed below.

**II. Defendants' Copying**

92. Defendants have intentionally copied Plaintiff's Trade Dress at

https://bestbeardstuff.com/pages/beard-growth-kits and other URLs on bestbeardstuff.com, element-by-element and in places word-for-word.

93. **The tier ladder:** Plaintiff's three-tier structure includes "The Starter Kit," "The Advanced Kit" and "The Ultimate Kit." On information and belief, Defendants created their three-tier structure by copying Plaintiff's Trade Dress. BBS sells three beard growth kits labeled "Level 1," "Level 2," and "Level 3."




[continued on next page]




94. The underlying code of Defendants' website reveals that the internal labels embedded in the site match Plaintiff's naming structure. For example, Defendants host their kit images at the following urls (emphasis added):

- https://bestbeardstuff.com/cdn/shop/files/**StarterKit**_6e24ba9c-53e0-4f87-8680-b83574a0400ed.png
- https://cdn.shopify.com/s/files/1/0564/9131/1171/files/**AdvancedKit**.png
- https://cdn.shopify.com/s/files/1/0564/9131/1171/files/**UltimateKit**_3ac942ac-c57b-451a-9597-8f41e8f9b9e7.png

95. A "web" search on Google for "beard growth ultimate beard growth kit" produces multiple hits for The Beard Club's own Ultimate Beard Growth Kit sold on its e-commerce page and other pages, social media pages about The Beard

Club's beard growth kits, and three other growth kits plus Defendants' in the first two pages of hits.

96. **The purchase block:** Each Defendant kit carries a product photograph, an "Add to Cart" control, a parenthetical review count, and a "See What's Inside" link, which are the same components in the same order as Plaintiff's.







97. **The disclosure section:** Each is headed "What's Inside [Kit Name]," with the kit name set in bold within the heading, exactly matching Plaintiff's "What's Inside [Kit Name]."






98. **The product module:** Defendants present each kit item as a product render isolated on a plain background, the product name as a bold heading beneath it, and a one- to two-sentence description of the item's function.

99. **Verbatim copying of Plaintiff's product copy:** Plaintiff describes its derma roller as follows: "Tiny micro-needles help to stimulate new facial hair growth, activate dormant hair follicles, and improve skin texture." Defendants describe their Titanium Beard Roller as follows: "Tiny micro-needles help to stimulate new facial hair growth, activate dormant hair follicles, and boost serum absorption." The first thirteen words are identical. Defendants changed only the final clause.







100. **Verbatim copying of Plaintiff's guarantee block:** Plaintiff's block displays "42,000+ 5-STAR REVIEWS," then the headline "BEARD GROWTH, GUARANTEED," then: "No results using our regimen? You'll get a full refund with our Growth Guarantee." Defendants' block displays "13,000+ 5-STAR REVIEWS," then the headline "BEARD GROWTH GUARANTEED," then: "No results in 30 days? You'll get a full refund with our Growth Guarantee." The layout, the sequence, and the closing clause are Plaintiff's.

[continued on next page]


42,000+ 5-STAR REVIEWS
BEARD GROWTH, GUARANTEED
No results using our regimen? You'll get a **full refund** with our **Growth Guarantee.**
TRY A GROWTH KIT




101. "Growth Guarantee" is Plaintiff's name for its refund program. Plaintiff maintains a dedicated page for it at thebeardclub.com/pages/growth-guarantee and references it in its cart and product pages. Defendants adopted the same term for their own refund program and describe it, as Plaintiff does, as "our Growth Guarantee."







102. **Verbatim copying of the "How It Works" sequence:** Defendants present a three-step sequence in the same format as Plaintiff's, including line-art icon, capitalized step name, single explanatory line. Defendants' second step is headed

"DELIVERED TO YOUR DOOR," identical to Plaintiff's. Defendants' third step carries the explanatory line "Easily manage monthly renewals, cancel anytime," which is Plaintiff's line word for word.







103. **The "Featured In" strip:** Defendants display a horizontal publication logo strip headed "FEATURED IN," in the same position relative to the kit presentation.







104. The copied elements are not required to sell beard growth kits online. Defendants had numerous alternatives available and chose to intentionally mimic Plaintiff's Trade Dress.

105. On information and belief, the copying is deliberate. Defendants target Plaintiff's customers in their advertising, use Plaintiff's products in their videos, depict Plaintiff's product in the photograph at Exhibit E, and host kit images named for Plaintiff's product tiers. The similarities go beyond generic website functions and are intentionally designed to look like The Beard Club's website to trade on Plaintiff's hard-earned goodwill associated with the Trade Dress.

**III. Confusion**

106. The Beard Club's Trade Dress has acquired secondary meaning among consumers in the beard-growth market. Consumers who encounter the Trade Dress associate it with The Beard Club as the source of the products presented. This is evidenced by the actual consumer confusion that already exists between Plaintiff and Defendants.

107. Numerous consumers have contacted The Beard Club believing that

they purchased from The Beard Club (despite having purchased from BBS) or that BBS products were The Beard Club's products and have attempted to return those products or cancel their subscriptions through The Beard Club. The customer-service tickets document source confusion, and some consumers have requested refunds or order cancellations from The Beard Club for BBS products. Those contacts are the direct result of the combined effect of the copied Trade Dress, overlapping advertising channels, and BBS's targeting of The Beard Club's customer base.

108. As a result, the Beard Club's cost per customer acquisition and retention has risen. Significant employee time is being diverted to managing Defendants' botched sales. Plaintiff's goodwill is being eroded by Defendants' infringement. The Beard Club loses customers and sales when consumers mistakenly purchase Defendants' products when they intend to purchase Plaintiff's. The Beard Club also incurs expenses responding to refund requests initiated over BBS products, correcting source confusion, and protecting its goodwill. The amount of damages will be established through sales, advertising, customer-service, and financial records.

109. Defendants copied Plaintiff's Trade Dress deliberately with the intent to confuse consumers and capitalize on Plaintiff's goodwill. Such willful infringement relating to directly competing products promoted to overlapping consumers through identical channels supports a finding that the case is exceptional. Consumers are likely to mistakenly believe that Defendants' site is Plaintiff's, and/or that

Defendants and their products are affiliated with or sponsored or endorsed by Plaintiff. Additionally, Plaintiff suffers when Defendants erode consumers' trust. Defendants' infringement of the Trade Dress remains live on their website, and consumers continue to contact Plaintiff regarding purchases made from Defendants. Each such consumer who is disappointed by Defendants' products attributes that disappointment to Plaintiff, and the resulting injury to Plaintiff's reputation and goodwill compounds for as long as the copying continues. Plaintiff cannot correct a misapprehension it never learns of, and injury to goodwill is not fully compensable with monetary damages alone.

110. The advertising, statements, and website content described in this Complaint, including the advertorial pages described in Section B and attached as Exhibits A through F, the product claims described in Section C, Chang's disparaging statements described in Section D, and the Trade Dress infringement described in Section E, have been used in and disseminated through interstate commerce. Defendants publish this content through bestbeardstuff.com and associated pages, their Amazon store, TikTok, Instagram, Facebook, and other social media and paid advertising channels, and through search engines such as Google, each of which reaches consumers throughout the United States.

## FIRST CAUSE OF ACTION

### False Advertising (15 U.S.C. § 1125(a)(1)(B)) — Against All Defendants

111. Plaintiff repeats, realleges, and incorporates each and every allegation of the foregoing paragraphs 1–110, as though fully set forth herein.

112. Each of Defendants' challenged advertising claims described herein is literally false or intentionally misleading, likely to deceive a substantial portion of relevant consumers, made in interstate commerce, material to the purchasing decisions of reasonable consumers, and likely to injure Plaintiff.

113. Defendants made literally false and intentionally misleading statements of fact in commercial advertising about the performance, efficacy, qualities, and comparative effectiveness of GROW® XXL and related beard growth products, and about The Beard Club's beard growth products. The literally false and intentionally misleading representations of fact were disseminated to consumers of beard growth products for the purpose of trying to sell BBS beard growth products and to divert purchases of beard growth products from The Beard Club.

114. Consumers will reasonably understand those representations to mean that GROW® XXL and other BBS beard growth products are clinically validated, independently endorsed, and more effective than competing products and that Defendant's advertisements are independent editorial or news reporting. The statements are literally false where they assert nonexistent institutions, events, results, efficacy measurements, comparative benefits, or endorsements, and implicitly false or intentionally misleading where they omit or distort facts that would be necessary to prevent the deceptive conclusions BBS conveys.

115. These statements are material and likely to influence purchasing decisions of beard growth consumers. Each of Defendants' false and intentionally misleading statements materially misrepresent inherent qualities and characteristics

of the relevant products, including their efficacy in growing beard hair and third-party validation of same. Defendants place the statements next to purchase buttons, discounts, urgency messages, social media advertising, and calls to purchase and use BBS products instead of competing products, including calls to use BBS products instead of The Beard Club products.

116. Defendants caused each of the challenged statements to enter interstate commerce through their website, Amazon, TikTok, Instagram, and other paid social platforms.

117. Defendants further disseminated false statements of fact in commercial advertising about The Beard Club's products, including the statement that The Beard Club's beard oil caused "itchy skin" and the depiction and statement that consumers would soon throw The Beard Club's products in the trash. The statements were directed to prospective purchasers of The Beard Club's beard growth products.

118. The statements are false or misleading, were made without competent substantiation, and were disseminated knowingly or with reckless disregard for their truth. Defendants used The Beard Club's products and brand cues to make the statements identifiable to the market and to induce consumers to buy from BBS instead. Each of Defendants' false and intentionally misleading statements are material to purchasing decisions because they denigrate inherent qualities and characteristics of Plaintiff's products, namely, their quality, efficacy, and safety.

119. Each of Defendants' literally false and intentionally misleading statements challenged herein are likely to deceive a substantial portion of the relevant

consumers for beard growth products.

120. Plaintiff has been and is likely to be injured as a direct and proximate result through lost sales, diverted customers, increased customer-acquisition costs, price erosion, corrective-advertising expenses, and harm to its commercial reputation and goodwill. Plaintiff's injuries fall within the zone of interests protected by the Lanham Act and were proximately caused by Defendants' misrepresentations. *Lexmark Int'l, Inc. v. Static Control Components*, Inc., 572 U.S. 118 (2014).

121. Defendants' activities have caused and, unless enjoined, will continue to cause consumers to make purchases on false premises and injury to Plaintiff's goodwill and customer relationships, for which Plaintiff has no adequate remedy at law. Plaintiff is entitled to injunctive relief under 15 U.S.C. § 1116.

122. Plaintiff is entitled to recover its actual damages, Defendants' profits, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1116, 1117, and 1125, without double recovery.

123. The scale, specificity, intentionality, and continued dissemination of the claims support disgorgement, enhanced damages and profits, and attorneys' fees for an exceptional case under the Lanham Act.

## SECOND CAUSE OF ACTION

### Trade Dress Infringement and False Designation of Origin (15 U.S.C. § 1125(a)(1)(A)) — Against All Defendants

124. Plaintiff repeats, realleges, and incorporates each and every allegation of the foregoing paragraphs 1–110, as though fully set forth herein.

125. The Beard Club owns prior rights in its distinctive, nonfunctional Trade Dress in its website presentation as described in Section E(I) above. That Trade Dress is inherently distinctive and has acquired secondary meaning among consumers in the beard-growth market.

126. Defendants' lookalike website and "How It Works" presentation create consumer confusion with The Beard Club. By copying the protectable elements of The Beard Club's website Trade Dress, Defendants used a false designation of origin and a representation likely to cause confusion as to the source, sponsorship, or affiliation of BBS and its products with The Beard Club, in violation of 15 U.S.C. § 1125(a)(1)(A). Defendants have used the copied Trade Dress in interstate commerce, including on bestbeardstuff.com, in connection with the advertising and sale of directly competing BBS products to overlapping consumers throughout the United States. Defendants had numerous other design options available and intentionally chose to copy Plaintiff's Trade Dress.

127. The likelihood of confusion is confirmed by actual consumer confusion evidence. Multiple consumers have contacted The Beard Club believing that BBS products were The Beard Club's, including requests for refunds for products Plaintiff never sold or shipped. The confusion is ongoing.

128. Defendants' conduct has caused and will continue to cause lost sales, diverted customers, increased acquisition costs, harm to goodwill, and consumer confusion for which Plaintiff has no adequate remedy at law. Plaintiff is entitled to injunctive relief under 15 U.S.C. § 1116.

129. Plaintiff is entitled to recover its actual damages, Defendants' profits, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1116, 1117, and 1125, without double recovery.

## THIRD CAUSE OF ACTION

### Florida Deceptive and Unfair Trade Practices Act
### (Fla. Stat. § 501.201 et seq.) — Against All Defendants

130. Plaintiff repeats, realleges, and incorporates each and every allegation of the foregoing paragraphs 1–110, as though fully set forth herein.

131. Defendants engaged in unfair methods of competition and unconscionable, deceptive, and unfair acts in the conduct of trade or commerce in Florida.

132. The conduct is deceptive because it is likely to mislead a reasonable consumer about whether BBS products grow more beard hair, whether independent research or institutions validate that result, and whether BBS outperforms competing products. It is also unfair for the reasons alleged above, including the use of unsupported efficacy claims, false endorsements, source-confusing presentation, and targeted disparagement.

133. Plaintiff is a "person who has suffered a loss" within Fla. Stat. § 501.211(2). Defendants' conduct has directly and proximately caused Plaintiff actual economic injury, including diverted sales, increased customer-acquisition and retention costs, and expenses responding to confused consumers, in an amount to be proven at trial. Plaintiff's losses will continue to the extent Defendants' conduct

continues and their effects persist.

134. Plaintiff is entitled to declaratory and injunctive relief under Fla. Stat. § 501.211(1), damages under § 501.211(2), and attorneys' fees and costs under Fla. Stat. § 501.2105.

## FOURTH CAUSE OF ACTION

### Florida Common Law Unfair Competition — Against All Defendants

135. Plaintiff repeats, realleges, and incorporates each and every allegation of the foregoing paragraphs 1–110, as though fully set forth herein.

136. Defendants' conduct constitutes unfair competition under Florida common law. They used false efficacy and comparative claims, source-confusing presentation, targeted disparagement, and copied website elements to divert customers from a direct competitor.

137. By publishing false factual assertions about BBS products and The Beard Club's products, using copied source cues, and targeting Plaintiff's customers, Defendants sought to capture purchases from consumers who had been considering Plaintiff's products.

138. The facts alleged in paragraph 11-12, 14-15, 48, and 85–87, establish that Chang personally participated in, authorized, and directed the advertising at issue, including the social media efficacy and disparagement claims. Those allegations concern his own conduct, not passive ownership of CFPH.

139. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered lost sales, increased customer-acquisition costs, diverted customer

relationships, harm to goodwill, and irreparable injury for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Enter judgment for Plaintiff on all causes of action and against Defendants;

B. Preliminarily and permanently enjoin Defendants, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order, from:

(i) making or causing to be made any of the false and misleading advertising claims described herein;

(ii) representing that GROW® XXL or any BBS product was banned, restricted, or disqualified by any competition, governing body, or organization, or that any such body found any BBS product too effective to permit;

(iii) representing that any study, clinical trial, government agency, institution, competition, publication, or award has established, validated, or endorsed the efficacy of any BBS product;

(iv) representing that any BBS product produces any specified rate, percentage, or timeframe of hair or beard growth, follicle density, dermal thickness, or absorption, without competent and reliable scientific substantiation possessed before the representation is made;

(v) representing that The Beard Club's products cause skin irritation or any other adverse effect, are placebos, are ineffective, or are inferior to any BBS product, without competent and reliable scientific substantiation;

(vi) representing that any BBS product is made, handcrafted, or manufactured in the United States unless all or virtually all of the product is of United States origin;

(vii) representing that any BBS product is "all natural," "organic," or made with organic ingredients, unless the product is made with ingredients certified as organic by an independent certifying body and contains no synthetic ingredients;

(viii) representing that any BBS product is the number one selling, number one rated, or best-selling product in any market, without substantiation;

(ix) publishing or causing to be published any advertisement formatted to resemble news reporting, independent journalism, or independent product review without clear and conspicuous disclosure that the content is Defendants' advertising; and

(x) using any website presentation, product descriptions, the term "Growth Guarantee," or any other presentation or term confusingly similar to the Trade Dress.

C. Order Defendants to remove the challenged advertising claims and

infringing webpages wherever they may appear in all forms, media, and channels owned, controlled, or sponsored by Defendants, including bestbeardstuff.com and all associated pages, including Exhibits A through F, Amazon, TikTok, Instagram, Facebook, and other social platforms;

D. Order Defendants to remove the content at the URLs for Exhibits A through F and replace the content with corrective advertising, under 15 U.S.C. § 1116(a);

E. Order Defendants to undertake corrective advertising, under 15 U.S.C. § 1116(a), that is clear, conspicuous, and reasonably calculated to reach consumers exposed to the challenged campaign through all e-commerce and marketing channels in which Defendants made the deceptive claims and to correct the false or misleading efficacy, competition, scientific, institutional, media, award, composition, origin, pricing, and comparison claims;

F. Require Defendants to file with the Court and serve upon counsel for Plaintiff, within thirty (30) days after entry of judgment, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and corrective-advertising order;

G. Authorize Plaintiff to serve a copy of the Court's order upon any service provider hosting or distributing the enjoined content, and direct those providers to disable access to content Defendants fail to remove;

H. Require Defendants to account for and pay over to Plaintiff all profits derived from the conduct alleged herein, and grant Plaintiff leave to conduct

discovery, and to be heard at an evidentiary hearing, on the amount of Defendants' sales, revenues, and profits and on Plaintiff's damages;

I. Award Plaintiff monetary relief in an amount to be determined at trial, but in no event less than $500,000, including its actual damages, Defendants' profits, enhanced or treble damages and enhanced profits as permitted by law, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1116 and 1117, this being an exceptional case;

J. Award Plaintiff declaratory and injunctive relief, actual damages, and attorneys' fees and costs under Fla. Stat. §§ 501.211 and 501.2105;

K. Award Plaintiff all damages and equitable relief available for the unfair-competition and product-disparagement claims;

L. Award pre- and post-judgment interest and grant such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff The Beard Club, Inc. hereby demands a trial by jury as provided by Rule 38(a) of the Federal Rules of Civil Procedure on all issues and claims so triable in this action.

Dated: October 19, 2026

Respectfully Submitted,

*/s/ David A. Karp*
David A. Karp
Florida Bar No. 69226
Ciara Nicole Barone
Florida Bar No. 1060040
CARLTON FIELDS P.A.
2 MiamiCentral
700 N.W. First Avenue, Suite 1200
Miami, Florida 33136-4118
(305) 539-7280
(305) 539-7290
dkarp@carltonfields.com
cbarone@carltonfields.com

Michael R. Justus
Florida Bar No. 1041268
J. Coy Stull
Florida Bar No. 15764
CARLTON FIELDS P.A.
4221 W. Boy Scout Blvd, Suite 1000
Tampa, Florida 33607-5780
(813) 229-4175
(813) 229-4120
michael.justus@carltonfields.com
jstull@carltonfields.com

Kimberly Culp
(*Pro hac vice* forthcoming)
kculp@fenwick.com
Donna Kwon (*Pro hac vice* forthcoming)
dkwon@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
(650) 335-7138
(212) 430-2671

*Counsel for Plaintiff The Beard Club, Inc.*

146686057.#